IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SALLY J. EASTEP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 06-1538 |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

## I. Introduction

Plaintiff, Sally J. Eastep, seeks judicial review of a
decision of Defendant, Commissioner of Social Security
("Commissioner"), denying her application for supplemental
security income ("SSI") under Title XVI of the Social Security
Act, 42 U.S.C. §§ 401-433.[1]  Presently before the Court are the
parties' cross-motions for summary judgment pursuant to
Fed.R.Civ.P. 56.  For the reasons set forth below, Plaintiff's
motion for summary judgment will be denied, and the
Commissioner's cross-motion for summary judgment will be granted.

---

[1]A person is eligible for SSI if he or she is disabled as
that term is defined in the Social Security Act and his or her
income and financial resources are below a certain level.

1

## II. Background

### A. Procedural History

Plaintiff protectively filed an application for SSI on

December 23, 2003, alleging disability since September 1, 1996

due to social anxiety, depression, panic disorder and vision

problems.[2]  (Certified Copy of Administrative Record, "R." at 136-

39, 145, 165).  Following the denial of the application,

Plaintiff requested a hearing before an Administrative Law Judge

("ALJ").  (R. 119-20, 125).  At the hearing, which was held by

ALJ Alma Deleon on December 9, 2005, Plaintiff, who was

represented by counsel, and a vocational expert ("VE") testified.

(R. 406-27).

On April 25, 2006, the ALJ issued a decision denying

---

[2]Plaintiff filed a previous application for SSI on December
20, 2001.  In the initial application, Plaintiff also alleged
that she had been disabled since September 1, 1996 due to
depression, panic attacks and anxiety.  (R. 55-57, 68).  By
letter dated April 30, 2002, Plaintiff was notified that her SSI
application had been denied.  Plaintiff filed a timely request
for a hearing before an ALJ, and a hearing was scheduled for
October 24, 2002.  (R. 41-45).  Despite acknowledgment of having
received notice of the hearing, Plaintiff failed to appear.  On
the same day, Plaintiff's counsel contacted the ALJ's office to
report that he was withdrawing as Plaintiff's counsel due to her
failure to return his telephone calls or meet with him to discuss
her case.  Based on the foregoing, the ALJ entered an order on
October 25, 2002, dismissing Plaintiff's request for a hearing
and stating that the adverse determination dated April 30, 2002
remained in effect.  (R. 30-31).  Plaintiff took no further
action with respect to her initial application for SSI.  (R. 13).
Thus, despite an alleged onset date of disability of September 1,
1996, it appears that any claim by Plaintiff for SSI before May
1, 2002 is barred.

2

Plaintiff's application for SSI based on her conclusion that Plaintiff retained the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.[3] Plaintiff filed a request for review of the ALJ's decision. However, the request was denied by the Appeals Council on September 15, 2006. (R. 6-9). As a result, the ALJ's decision became the final decision of the Commissioner. This appeal followed.

## B. Factual Background

Plaintiff was born on December 25, 1963. She was 41 years old at the time of the hearing before the ALJ on December 9, 2005. Plaintiff did not finish high school; however, she did obtain a General Equivalency Diploma. (R. 410). Plaintiff has never held a job for more than 6 months. (R. 414).

With respect to her alleged disabling impairments, Plaintiff testified that she is a mental and emotional "mess;" that she has panic attacks almost daily; that she does not like to be around people; that she cannot concentrate; that she does not sleep well;[4] that she suffers from asthma for which she takes medication and uses an inhaler on a daily basis; and that she has a history

---

[3]The Social Security Regulations define RFC as the most a claimant can still do despite his or her limitations. 20 C.F.R. § 404.1545.

[4]Regarding sleep, Plaintiff testified that she can fall asleep, but she does not stay asleep. As a result, she naps once a day for an hour or two. (R. 419).

3

of alcohol abuse, although she had not had a drink in "months" at the time of hearing.[5]  (R. 410-12, 414-15, 418).  As to medications, Plaintiff testified that she was taking Zyprexa, Remeron and Lorazepam, but the medications did not control her panic attacks or help her sleep.[6]  (R. 414, 424).  Plaintiff's primary care physician is Dr. James C. Matthews, and she receives mental health treatment at the Irene Stacey Community Mental Health Center ("Irene Stacey MH Center").  (R. 421).

## C. Vocational Expert Testimony

At the hearing on Plaintiff's application for SSI, the ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education and work experience who is capable of performing work at all exertion levels that does not involve dealing with the public, more than minimal interaction with peers and supervisors, complex decisionmaking, detailed instructions, an ability to cope with stress in emergency situations, and the need to adapt to frequent changes in the work setting.  The ALJ then

---

[5]With respect to alcohol abuse, Plaintiff also testified that she attends Alcoholics Anonymous ("AA") meetings three times a week.  (R. 423).

[6]Zyprexa is used to treat symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions).  It is also used to treat bipolar disorder (manic depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods).  It is in a class of medications called atypical antipsychotics.  Remeron is used to treat depression, and Lorazepam is used to relieve anxiety.  *See* www.nlm.nih.gov/medlineplus/druginfo (last visited 11/16/2007).

4

asked the VE whether the hypothetical individual could perform
any jobs existing in significant numbers in the national economy.
The VE responded affirmatively, identifying the jobs of light
housekeeper (in excess of 1,000,000 jobs nationally), light
packer (700,000 jobs nationally), and light assembler (in excess
of 1,000,000 jobs nationally). (R. 424-25). The ALJ then asked
the VE whether the hypothetical individual could perform the
cited jobs if, in addition, the individual must avoid exposure to
dust, chemicals and fumes. In response, the VE testified that
the additional limitation would eliminate the cleaning job, but
that the job of an inspector (50,000 jobs nationally) could be
substituted for the cleaning job. (R. 425). Finally, in
response to a question by Plaintiff's counsel, the VE testified
that the hypothetical individual could not perform any of the
cited jobs if he or she could not perform routine tasks on a
continuing basis.[7] (R. 426).

## D. Medical Evidence

On February 13, 2002, Julie Uran, Ph.D., performed a

_____

[7]Social Security Rulings are agency rulings published "under
the authority of the Commissioner of Social Security" and "are
binding on all components of the Social Security Administration."
Sykes v. Apfel, 228 F.3d 259, 271 (3d Cir.2000). With respect to
counsel's question to the VE, Social Security Ruling 96-8p
provides that "RFC is an assessment of an individual's ability to
do sustained work-related physical and mental activities in a
work setting on a regular and continuing basis. A 'regular and
continuing basis' means 8 hours a day, for 5 days a week, or an
equivalent work schedule."

5

consultative psychological evaluation of Plaintiff in connection with her initial application for SSI.  Based on the history provided by Plaintiff and her mental status examination, Dr. Uran diagnosed Plaintiff as suffering from Anxiety Disorder, (NOS), Depressive Disorder, (NOS) and Alcohol Dependence,[8] and she assessed Plaintiff's score on the Global Assessment of Functioning ("GAF") Scale to be between 50 and 55.[9]  Dr. Uran indicated that Plaintiff's prognosis in terms of higher level functioning and personality integration was "poor."  (R. 202-06). With respect to making occupational adjustments, Dr. Uran opined that Plaintiff's ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with

_____

[8]With respect to Plaintiff's diagnoses, Dr. Uran also indicated that Attention Deficit Hyperactivity Disorder, Inattentive Type and Below Average IQ needed to be ruled out. (R. 206).

[9]The GAF Scale considers psychological, social, and occupational functioning on a hypothetical continuum of mental health to illness.  The highest possible score is 100, and the lowest is 1.  The GAF Scale is used by clinicians to report an individual's overall level of functioning.  The GAF Scale does not evaluate impairments caused by physical or environmental factors. A GAF score between 41 and 50 denotes **"[s]erious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., few friends, unable to keep a job)."  A GAF score between 51 and 60 denotes **"[m]oderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers)".  American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000, at 32-34 ("DSM-IV").  (Bold face in original).

6

supervisors and maintain attention/concentration was "fair," and her ability to deal with work stresses and function independently was "poor to none." As to making performance adjustments, such as understanding, remembering and carrying out simple, detailed and complex job instructions, Dr. Uran opined that Plaintiff's ability was "fair." Finally, in connection with making personal-social adjustments, Dr. Uran opined that Plaintiff's ability to maintain her personal appearance, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability was "fair." (R. 208-09).

On December 22, 2002, Plaintiff was treated in the Emergency Room ("ER") of Butler Memorial Hospital for nose and forehead lacerations following an assault. The smell of alcohol was detected on Plaintiff's breath, and she acted inappropriately at times. An x-ray of Plaintiff's nose revealed bilateral nasal bone fractures. (R. 210-25).

On March 26, 2003, May 6, 2003 and May 7, 2003, Plaintiff presented to the ER of Butler Memorial Hospital with complaints of respiratory distress. Plaintiff was treated for pneumonia on all 3 occasions and released. (R. 226-54).

On May 8, 2003, Plaintiff presented to the ER of Butler Memorial Hospital with acute shortness of breath. She was intubated, sedated, evaluated, found to be suffering from bilateral pneumonia, and admitted to the hospital for IV therapy

7

and antibiotics. While in the hospital, Plaintiff was consulted by psychiatry. She was discharged from the hospital on May 13, 3003 with the following diagnoses: Acute Respiratory Failure, Asthma, Pneumonia, Alcohol Abuse, Neurotic Disorder and Tobacco Use. (R. 256-61).

On May 22, 2003, Plaintiff was seen by a nurse practitioner at Nallathambi Medical Associates to follow-up on her recent hospitalization for pneumonia. With respect to her social history, Plaintiff denied any significant history of alcohol usage; she denied illicit drug use; and she stated that she smoked less than ½ pack of cigarettes per day. As to medical history, Plaintiff reported alcohol dependence in remission ("no intake for 30 days, No rehab, quit on her own"), benign essential hypertension, asthma and depressive disorder.[10] Plaintiff was given new prescriptions for Levaquin and an Advair inhaler,[11] and she was instructed to return in two weeks to see Dr. Nallathambi.[12] (R. 352-53).

_____

[10]Plaintiff was seen at Nallathambi Medical Associates for the first time on May 22, 2003 to get established with the practice. As a result, she was asked to provide information concerning her social and medical history. (R. 352).

[11]Levaquin is an antibiotic that is used to treat infections such as pneumonia. Advair is used to prevent wheezing, shortness of breath and breathing difficulties caused by asthma and chronic obstructive pulmonary disease. *See* www.nlm.nih.gov/medlineplus/druginfo (last visited 11/16/2007)

[12]Plaintiff saw Dr. Nallathambi to follow-up on the pneumonia on June 3, 2003. However, the notes of this visit are sparse and

8

On August 12, 2003, Plaintiff was admitted to Butler Memorial Hospital for alcohol detoxification. She was discharged on August 16, 2003 with the following final diagnoses: Alcoholism, Alcohol withdrawal, Dysfunctional uterine bleeding, Chronic bronchitis, Endometriosis and Chronic abdominal pain. The discharge summary noted that Plaintiff has a long history of alcoholism, as well as a history of endometriosis causing chronic abdominal pain and abnormal vaginal bleeding; that her gynecologist, Dr. Tolentino, had recommended a hysterectomy as definitive treatment for the endometriosis; that Plaintiff had been scheduled for a hysterectomy on at least two occasions, but the surgeries were cancelled because she presented to the hospital in an intoxicated state; that, unfortunately, Plaintiff had presented to the hospital again for a hysterectomy in an intoxicated state; that, as a result, she had been admitted to the hospital for alcohol detoxification; that her hospital stay was relatively unremarkable and she was feeling better after 3 or 4 days; and that a hysterectomy had been scheduled again for August 19, 2003.[13] (R. 294-303).

On August 27, 2003, Plaintiff was seen by the nurse

largely illegible. (R. 351).

[13]Dr. Tolentino did perform a total abdominal hysterectomy on Plaintiff on August 19, 2003 at Butler Memorial Hospital. She did very well following the surgery and was discharged on August 21, 2003. (R. 282-92).

9

practitioner at Nallathambi Medical Associates for evaluation of chest congestion, sneezing and shortness of breath of 4 days' duration. Plaintiff was given a prescription for Allegra and instructed to continue using her Advair inhaler.[14] Plaintiff also was instructed to return in one month to see Dr. Matthews.[15] (R. 350).

On September 24, 2003, Plaintiff was seen by Dr. Matthews for an upper respiratory infection, low abdominal pain and a refill of Lorazepam. The doctor's impression was bronchitis, anxiety and a history of alcoholism, and he gave Plaintiff new prescriptions for Levaquin and Lorazepam. (R. 348).

On November 4, 2003, Plaintiff was seen by Dr. Matthews for complaints of chest congestion, sore throat, body aches and coughing up blood. Medication was prescribed.[16] (R. 347). On November 26, 2003, Plaintiff presented to the ER of Butler Memorial Hospital following an assault, and a laceration on her forehead was sutured. (R. 304-16). Dr. Matthews removed the

---

[14]Allegra is used to relieve the allergy symptoms of seasonal allergic rhinitis ("hay fever"), including runny nose; sneezing; red, itchy or watery eyes; or itching of the nose, throat or roof of the mouth. *See* www.nlm.nih.gov/medlineplus/druginfo (last visited 11/16/2007).

[15]As noted previously, at the time of the hearing before the ALJ, Dr. Matthews continued to be Plaintiff's primary care physician.

[16]With respect to the type of medication prescribed, the notes of this office visit are illegible. (R. 347).

stitches from Plaintiff's forehead on December 2, 2003, noting
that Plaintiff had the smell of alcohol on her breath. (R. 346).

On December 9, 2003, Plaintiff was seen by Dr. Matthews
complaining of rib pain, cough, congestion and shortness of
breath. Plaintiff's diagnoses were bronchitis and right anterior
chest wall pain, and she was given prescriptions for Levaquin and
Phenergan with Codeine.[17] (R. 345). When Plaintiff was seen by
Dr. Matthews on December 16, 2003, she requested Advair samples.
However, due to the unavailability of such samples, she was given
samples of a similar medication. (R. 347). On December 19,
2003, Dr. Matthews' office called in prescriptions for Lorazepam
and Robitussin to Plaintiff's pharmacy.[18] (R. 347). On December
30, 2003, Plaintiff complained of a constant dry cough to Dr.
Matthews, requesting a prescription for a cough syrup. (R. 343).

On January 17, 2004, Plaintiff was admitted to Butler
Memorial Hospital on a "302" petition filed by a friend who
believed that Plaintiff had engaged in a suicidal gesture by

---

[17]Phenergan is used to relieve the symptoms of allergic
reactions such as allergic rhinitis (runny nose and watery eyes
caused by allergy to pollen, mold or dust). Codeine is used,
usually in combination with other medications, to reduce
coughing. *See* www.nlm.nih.gov/medlineplus/druginfo (last visited
11/16/2007).

[18]Robitussin thins the mucus in the air passages and makes it
easier to cough up the mucus and clear the airways, allowing you
to breathe more easily. It relieves the coughs of colds,
bronchitis and other lung infections. *See* www.nlm.nih.gov/
medlineplus/druginfo (last visited 11/16/2007).

11

taking a drug overdose.[19] At the time of admission, Plaintiff was
intoxicated. However, she adamantly denied intentionally taking
a drug overdose, and Plaintiff's friend admitted that she may
have overreacted by filing the "302" petition.[20] At the time of
admission, Plaintiff denied depressive, anxious, manic or
psychotic symptoms, and the initial impression was acute
alcoholism. Plaintiff's GAF score was assessed to be between 25
and 35 at the time of admission.[21] Due to her history of anxiety
and panic attacks, Plaintiff was started on Paxil because she
indicated that this medication had been helpful in the past.[22]

---

[19]A "302" petition refers to a Pennsylvania statute pursuant
to which a person who is believed to be severely mentally
disabled and in need of immediate treatment may be involuntarily
committed to a facility for examination and treatment not to
exceed 120 hours. *See* 50 P.S. § 7302.

[20]According to Plaintiff, her friend may have assumed she
took an overdose of drugs due to the presence of an empty bottle
of medication in her room. (R. 331).

[21]A GAF score between 21 and 30 denotes **"[b]ehavior that is
considerably influenced by delusions or hallucinations OR serious
impairment in communication or judgment** (e.g., sometimes
incoherent, acts grossly inappropriately, suicidal preoccupation)
**OR inability to function in almost all areas** (e.g., stays in bed
all day; no job, home, or friends)," and a GAF score between 31
and 40 denotes **"[s]ome impairment in reality testing or
communication** (e.g., speech is at times illogical, obscure, or
irrelevant) **OR major impairment in several areas, such as work or
school, family relations, judgment, thinking, or mood** (e.g.,
depressed man avoids friends, neglects family, and is unable to
work; child frequently beats up younger children, is defiant at
home, and is failing at school)." DSM-IV, at 32-34.

[22]Paxil is used to treat depression, panic disorder (sudden,
unexpected attacks of extreme fear and worry about these
attacks), and social anxiety disorder (extreme fear of

12

Plaintiff was discharged on January 19, 2004 with the diagnoses of Adjustment disorder, Mixed emotions and conduct, Alcohol dependence and Rule out mood disorder secondary to alcohol dependence, and her GAF score at the time of discharge was assessed to be between 45 and 50. Plaintiff's mental status examination at the time of discharge was described as follows:

MENTAL STATUS EXAM: The patient is a middle age white female who was cooperative and appropriate. Mood was good. Affect was congruent. Speech and thoughts within normal limits with no thought disorder, denying any suicidal or homicidal ideations. Alert and oriented x three with improved insight and judgement.

(R. 317-38).

On February 2, 2004, Plaintiff was seen by Dr. Matthews for a rash on her feet. Based on Plaintiff's report that she was getting relief from over the counter medication and powder, it does not appear that Dr. Matthews prescribed any medication for the rash. However, Plaintiff's asthma medications were refilled and she was given a new prescription for Lorazepam. (R. 341).

Another prescription for Lorazepam was called into Plaintiff's pharmacy by Dr. Matthews' office on March 2, 2004. (R. 341). On March 10, 2004, Plaintiff saw Dr. Matthews for complaints of sinus and allergy problems, head and chest congestion, sore throat, runny nose and increased anxiety. The

interacting with others or performing in front of others that interferes with normal life). *See* www.nlm.nih.gov/medlineplus/druginfo (last visited 11/16/2007).

13

doctor's impression was rhinitis and anxiety and depression. The notes of this office visit indicate that Plaintiff's anxiety was followed at the Irene Stacey MH Center; that Plaintiff was taking Paxil, Lorazepam and Seroquel; and that Plaintiff was asking for Xanax.[23] (R. 340).

On April 29, 2004, Julie Uran, Ph.D., performed a consultative psychological evaluation of Plaintiff in connection with her current application for SSI. Based on Plaintiff's reported history and a mental status examination, Dr. Uran diagnosed Plaintiff as suffering from Major Depression, recurrent, Panic Disorder without Agoraphobia, Primary Insomnia, Post-traumatic Stress Disorder, Alcohol Abuse, Cannabis Abuse (in remission) and Cocaine Abuse (in remission),[24] and she assessed Plaintiff's GAF score to be between 50 and 55. Dr. Uran deemed Plaintiff's prognosis to be "poor." Due to depression and anxiety, Dr. Uran opined that Plaintiff was "extremely" limited in her ability to perform the following work-related activities: (1) understand, remember and carry out detailed instructions, (2) make judgments on simple work-related decisions, (3) interact

---

[23]Seroquel is used to treat the symptoms of schizophrenia, and episodes of mania and depression in patients with bipolar disorder. Xanax is used to treat anxiety disorders and panic attacks. *See* www.nlm.nih.gov/medlineplus/druginfo (last visited 11/16/2007).

[24]Dr. Uran's diagnosis of Post-traumatic Stress Disorder was based on Plaintiff's report of having been physically attacked by a stranger in 2003. (R. 356).

14

appropriately with the public, supervisors and co-workers, (4) respond appropriately to work pressures in the usual work setting, and (5) respond appropriately to changes in a routine work setting. (R. 355-63).

On June 9, 2004, Edward Zuckerman, Ph.D., a non-examining State agency medical consultant, completed a Psychiatric Review Technique form in connection with Plaintiff's current application for SSI based on Listing 12.04 relating to Affective Disorders, Listing 12.06 relating to Anxiety-Related Disorders and Listing 12.09 relating to Substance Addiction Disorders. Regarding the degree of Plaintiff's limitations resulting from these disorders, Dr. Zuckerman opined that Plaintiff was mildly limited in Activities of Daily Living and Maintaining Social Functioning; that Plaintiff was moderately limited in Maintaining Concentration, Persistence or Pace; and that Plaintiff had experienced no Episodes of Decompensation, Each of Extended Duration. (R. 368-80).

Dr. Zuckerman also completed a mental RFC assessment for Plaintiff on June 9, 2004. With respect to various abilities relating to Understanding and Memory, Sustained Concentration and Persistence, Social Interaction and Adaptation, Dr. Zuckerman opined that Plaintiff was not significantly limited or only moderately limited. In sum, Dr. Zuckerman opined that "[t]he limitations resulting from the impairment are such that the

15

claimant would be able to meet the basic mental demands of competitive work on a sustained basis." (R. 364-67).

On June 10, 2004, a State agency medical consultant completed a physical RFC assessment for Plaintiff on behalf of the Social Security Administration. In the assessment, which was based on Plaintiff's claim of disability due to chronic headaches accompanied by blurred vision, the consultant opined that Plaintiff had no exertional, postural, manipulative, visual, communicative or environmental limitations.[25] (R. 381-86).

On January 13, 2005, Plaintiff underwent an initial assessment at the Irene Stacey MH Center for drug and alcohol treatment. Dr. Randon C. Simmons, Medical Director and a psychiatrist, signed off on the initial assessment, together with Tara J. Hamilton, B.A., a Drug and Alcohol Specialist, and Betsy Duncan, B.S. Plaintiff reported that her first drug of choice was alcohol and her second drug of choice was marijuana. Plaintiff, who was described as a long-time client of the Irene Stacey MH Center, indicated that she "wants to get back on track and added that she wants to finish treatment this time around." Plaintiff reported that she had been isolating herself and having

---

[25]In the brief filed in support of her motion for summary judgment, Plaintiff does not challenge the ALJ's determination that she "does not have a documented severe impairment associated with headaches and vision." (R. 15). In fact, Plaintiff concedes that her "primary impairments are mental impairments." (Pl's Brief, Doc. No. 8, p. 2).

16

problems with racing thoughts and emotions, and that she wanted to address these issues in addition to her ongoing alcohol abuse. With respect to Plaintiff's mental status examination, it was noted that Plaintiff was appropriately dressed and groomed for the assessment; her speech and thought patterns were goal directed; her affect was appropriate; she was oriented to time, place and person; and her insight and judgment were poor. Plaintiff was referred to individual outpatient therapy and a psychiatric evaluation was scheduled to assess Plaintiff's anxiety symptoms, as well as the appropriateness of her current medication regimen. Plaintiff's GAF score was assessed to be 47, and her prognosis was described as "fair." (R. 399-402).

On February 28, 2005, Dr. Simmons and Dennis Love, a physician's assistant, performed a psychiatric evaluation of Plaintiff at the Irene Stacey MH Center. Among other things, the report of the evaluation noted that Plaintiff had been treated at this facility on 7 prior occasions, and that her chief complaint on the day of the evaluation was a worsening of her anxiety due to being off her medication for several months. With respect to Plaintiff's mental status examination, it was noted that she was dressed appropriately; she was pleasant and polite without agitation; her speech was of normal rate and rhythm with no pressure or loose association; her memory, recall and orientation were intact; her insight seemed good; and her judgment seemed

17

poor based on past decisions. As to treatment recommendations, Zyprexa was prescribed for Plaintiff and she was instructed to attend individual counseling every two weeks and continue attending AA meetings. (R. 397-98).

Plaintiff saw Dr. Simmons and Dennis Love for a medication check on May 31, 2005. Plaintiff's main complaint at that time was "trouble sleeping more than two hours a night." Plaintiff was instructed to increase her dosage of Zyprexa, and, if satisfied, stay on that dosage. If not satisfied, Plaintiff was instructed to further increase the dosage. (R. 396).

On September 8, 2005, Plaintiff was seen by Dr. Simmons and Dennis Love for another medication check. Plaintiff reported that she did not sleep well on the lower dosage of Zyprexa but could not tolerate the higher dosage. As a result, Remeron was prescribed for Plaintiff, in addition to the lower dosage of Zyprexa. (R. 395).

On October 28, 2005, Dr. Simmons and Dennis Love completed a medical source statement of Plaintiff's ability to perform work-related mental activities, indicating that Plaintiff was (1) "slightly" limited in her ability to understand and remember short, simple instructions, (2) "moderately" limited in her ability to carry out short, simple instructions and make judgments on simple work-related decisions, (3) "markedly" limited in her ability to understand, remember and carry out

detailed instructions, (4) "not" limited in her ability to
interact appropriately with co-workers, (5) "slightly" limited in
her ability to interact appropriately with supervisors, and (6)
"moderately" limited in her ability to interact appropriately
with the public, respond appropriately to work pressures in a
usual work setting and respond appropriately to changes in a
routine work setting. It was also noted that Plaintiff could
manage benefits in her own best interest. (R. 403-05).

### III.  Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under 42 U.S.C.
§ 1383(c)(3) (incorporating § 405(g)), which provides that an
individual may obtain judicial review of any final decision of
the Commissioner by bringing a civil action in the district court
of the United States for the judicial district in which the
individual resides. Based upon the pleadings and the transcript
of the record, the district court has the power to enter a
judgment affirming, modifying or reversing the Commissioner's
decision with or without a remand for a rehearing.

The Court's review of the Commissioner's decision is limited
to determining whether the decision is supported by substantial
evidence, which has been described as "such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).
It consists of something more than a mere scintilla, but

19

something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence. Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

## IV. Legal Analysis

### A. The ALJ's Decision

In order to establish a disability under the Social Security Act, a claimant must demonstrate an inability to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1). A Social Security claimant is considered unable to engage in any substantial gainful activity only if her physical or mental impairment or impairments are of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

In Burnett v. Commissioner of Social Security Admin., 220 F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure an ALJ must follow in evaluating a claim for Social Security

20

disability benefits, stating in relevant part:

\* \* \*

In <u>Plummer</u>, we recounted the five step sequential evaluation for determining whether a claimant is under a disability, as set forth in 20 C.F.R. § 404.1520:

In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a). If a claimant is found to be engaged in substantial gainful activity, the disability claim will be denied. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140, 107 S.Ct. 2287, 2290-91, 96 L.Ed.2d 119 (1987). In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. <u>Adorno v. Shalala</u>, 40 F.3d 43, 46 (3d Cir.1994).

If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effects of all the claimant's impairments in determining whether she is capable of performing work

21

and is not disabled.

Plummer, 186 F.3d at 428.

\* \* \*

220 F.3d at 118-19.

With respect to the ALJ's five-step sequential evaluation in the present case, steps one and two were resolved in Plaintiff's favor: that is, the ALJ found that Plaintiff had not engaged in substantial gainful activity at any time relevant to the decision and that Plaintiff suffers from the following severe impairments: "asthma, depression, anxiety, and a history of polysubstance abuse (with testimony indicating that she has been sober for at least several months now)."[26]  (R. 15).  As to step three, the ALJ

---

[26]If drug addiction or alcoholism is "a contributing factor material to the determination of disability," i.e., the claimant's remaining limitations would not be disabling, a claim for Social Security disability benefits must be denied.  See 20 C.F.R. § 416.935.  With respect to the evidence in the record concerning Plaintiff's history of substance abuse, the ALJ stated in her decision:

> The claimant's polysubstance abuse, in particular alcohol abuse, is in recent remission.  She participates in drug and alcohol counseling.  She testified that she stopped drinking alcohol months ago.  The record tends to show that when the claimant abstains from alcohol, her symptoms subside and are treatable with her medical regimen.  (Exhibit B-16F).  As explained below, I find after considering the totality of her impairments that she has not been disabled within the meaning of the Act at any time since her alleged onset. This moots the question of whether her past alcohol and mixed substance abuse is a contributing and material factor under Public Law 104.121 (20 CFR §416.935).

(R. 15).

22

found that Plaintiff did not have an impairment, or combination
of impairments, that meets or equals the criteria of any
impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1.[27]  (R.
15-16).  Turning to step four, the ALJ found that Plaintiff has
no past relevant work experience.  (R. 20).  Finally, at step
five, based on the testimony of the VE, the ALJ found that
considering Plaintiff's age, education, work experience and RFC,
there were a significant number of jobs in the national economy
which Plaintiff could perform, including the jobs of a packer
(700,000 jobs nationally), an assembler (1,000,000 jobs
nationally) and an inspector (50,000 jobs nationally).  (R. 20-
21).

## B. Plaintiff's Arguments

Plaintiff raises four arguments in support of her motion for
summary judgment which the Court will address individually.

i

First, Plaintiff asserts that the opinion of Dr. Simmons,
her treating psychiatrist, and the opinion of Julie Uran, Ph.D.,
the consultative psychological examiner, dictate a conclusion
that she is disabled, and that the ALJ erred by failing to give
controlling weight to those opinions.  After consideration, the

_____

[27]With regard to the ALJ's step three analysis, she
considered Listing 3.00 relating to the Respiratory System,
Listing 12.04 relating to Affective Disorders, Listing 12.06
relating to Anxiety-Related Disorders and Listing 12.09 relating
to Substance Addiction Disorders.

Court does not agree.

As an initial matter, the Court notes that opinions to which an ALJ may give controlling weight are limited to the opinions of a claimant's treating sources.  The Social Security Regulations provide in pertinent part:

**§ 416.927  Evaluating opinion evidence.**

\*  \*  \*

*(d) Treatment relationship.*  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

\*  \*  \*

20 C.F.R. § 416.927(d).

Thus, as a consultative examiner, the opinion of Dr. Uran was not entitled to controlling weight even if the opinion was well supported by the evidence and not inconsistent with other substantial evidence of record.

24

With respect to the ALJ's failure to give controlling weight to the opinion of Dr. Simmons, Plaintiff's treating psychiatrist, Plaintiff's argument is based solely on the GAF score of 47 assigned to Plaintiff by Dr. Simmons following her initial psychiatric assessment at the Irene Stacey MH Center on January 13, 2005.[28] (R. 402). However, "[c]linicians use a GAF scale to identify an individual's overall level of functioning, and a lower score 'may indicate problems that do not necessarily relate to the ability to hold a job.'" Ramos v. Barnhart, 2007 WL 1008495, *10 (E.D.Pa. March 30, 2007), *quoting*, Lopez v. Barnhart, 78 Fed. Appx. 675, 678 (10th Cir.2003)(not precedential). "Additionally, neither the regulations nor case law requires an ALJ to determine a claimant's disability based solely on her GAF score." *Id. See also* Santiago-Rivera v. Barnhart, 2006 WL 2794180, *9 (E.D.Pa. Sept. 26, 2006)(noting that pursuant to the Social Security Rules, "a claimant's GAF score is not considered to have a direct correlation to the severity requirements.").

Moreover, the medical source statement of Plaintiff's ability to perform specific work-related mental activities completed by Dr. Simmons on October 28, 2005 supports, rather than contradicts, the ALJ's decision in this case. As noted by

_____

[28]As noted in footnote 9, a GAF score between 41 and 50 denotes serious symptoms or any serious impairment in social, occupational, or school functioning.

the ALJ, the only area of work-related activity in which Dr.
Simmons opined that Plaintiff was "markedly" limited involved her
ability to understand, remember and carry out *detailed*
instructions (R. 18), and she adequately accommodated this
limitation in the RFC assessment by limiting Plaintiff to jobs
that do not involve detailed instructions. In all other areas
concerning work-related mental activities, Dr. Simmons opined
that Plaintiff was "not" limited, only "slightly" limited or only
"moderately" limited.[29] Accordingly, Plaintiff's argument that
the ALJ erred by failing to give controlling weight to the GAF
score of 47 assigned to Plaintiff by Dr. Simmons on January 13,
2005 is meritless.

Turning to the ALJ's rejection of Dr. Uran's opinion that
Plaintiff was "extremely" limited in numerous work-related
activities which was rendered following a consultative
psychological examination on April 29, 2004, although an ALJ
cannot reject evidence for no reason or the wrong reason, it is
clearly within the ALJ's statutory authority to choose whom to
credit when presented with conflicting evidence. *See* Cotter v.

---

[29]According to the instructions at the top of the medical
source statement completed by Dr. Simmons on October 28, 2005,
"not" limited means absent or minimal limitations; "slightly"
limited means some mild limitations, but the individual can
generally function well; "moderately" limited means there are
some moderate limitations but the individual is still able to
function satisfactorily; and "markedly" limited means seriously
limited but not precluded. (R. 404).

26

<u>Harris</u>, 642 F.2d 700, 707 (3d Cir.1981). Here, a review of the
ALJ's decision shows that she adequately set forth her reasons
for the weight accorded Dr. Uran's opinion regarding the extent
of Plaintiff's work-related mental limitations. Specifically,
the ALJ noted that Dr. Uran's opinion concerning Plaintiff's
"extreme" work-related mental limitations conflicts with her
objective findings during the April 29, 2004 consultative
psychological examination, as well as the objective findings of
Plaintiff's treating mental health sources at the Irene Stacey MH
Center, and appears to be based on the information provided by
Plaintiff during the consultative examination rather than Dr.
Uran's own independent findings. (R. 18-19). The ALJ noted
further that the opinion of the non-examining State agency
psychological consultant was entitled to more weight than the
opinion of Dr. Uran because the consultant adequately set forth
the rationale for his findings, and the findings were consistent
with the evidence from Plaintiff's treating mental health sources
and her daily activities.[30]   (R. 19).

_____

[30]As noted previously, the State agency psychological
consultant opined that Plaintiff was "not significantly" or
"moderately" limited in numerous work-related areas involving
Memory and Understanding, Sustained Concentration and
Persistence, Social Interaction and Adaptation. (R. 364-67).
The only significant difference between the opinion of the non-
examining State agency psychological consultant and the opinion
of Dr. Simmons concerning Plaintiff's ability to perform work-
related mental activities pertains to her ability to understand,
remember and carry out detailed instructions, and the ALJ
accommodated this limitation by restricting Plaintiff to work

27

Based on the foregoing, the Court is compelled to conclude that the weight accorded by the ALJ to the various medical opinions regarding Plaintiff's work-related mental limitations is supported by substantial evidence.

**ii**

Next, Plaintiff asserts that the ALJ erred by failing to find that her mental impairments meet the requirements of Parts A and B of Listing 12.04 and Parts A and B of Listing 12.06 in 20 C.F.R., Pt. 404, Subpt. P, App. 1.[31] After consideration, the Court cannot agree.

Listing 12.04 relates to Affective Disorders which are "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." The required level of severity for Listing 12.04 is met when the requirements of both Parts A and B are satisfied,[32] and these parts of the listing provide in

that did not involve detailed instructions.

[31]The Listing of Impairments in Part 404, Subpart P, Appendix 1 of the Social Security Regulations describes for each of the major body systems impairments that the Social Security Administration considers to be severe enough to prevent an individual from doing gainful activity, regardless of his or her age, education or work experience. *See* 20 C.F.R. § 416.925(a).

[32]The required level of severity for Listing 12.04 also may be met when the requirements of Part C are satisfied. However, Plaintiff has not argued that she meets the requirements of Part C. Therefore, the Court will not address this part of Listing

relevant part:

> A. Medically documented persistence, either continuous or intermittent, of one of the following:
>
> 1. Depressive syndrome characterized by at least four of the following:
> a. Anhedonia or pervasive loss of interest in almost all activities; or
> b. Appetite disturbance with change in weight; or
> c. Sleep disturbance; or
> d. Psychomotor agitation or retardation; or
> e. Decreased energy; or
> f. Feelings of guilt or worthlessness; or
> g. Difficulty concentrating or thinking; or
> h. Thoughts of suicide; or
> i. Hallucinations, delusions, or paranoid thinking;

*   *   *

AND

> B. Resulting in at least two of the following:
>
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

Listing 12.06 relates to Anxiety Related Disorders in which

"anxiety is either the predominant disturbance or it is

experienced if the individual attempts to master symptoms; for

example, confronting the dreaded object or situation in a phobic

disorder or resisting the obsessions or compulsions in obsessive

compulsive disorders." The required level of severity for

Listing 12.06 is met when the requirements of both Parts A and B

---

12.04.

are satisfied.[33] Part A of Listing 12.06 provides:

A. Medically documented findings of at least one of the following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
   a. Motor tension; or
   b. Autonomic hyperactivity; or
   c. Apprehensive expectation; or
   d. Vigilance and scanning;
   or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress;

\* \* \*

Part B of Listing 12.06 is identical to Part B of Listing 12.04.

With respect to Part A of Listing 12.04 and Part A of Listing 12.06, the ALJ found that the evidence in the record regarding Plaintiff's mental impairments "shows some but not all of the symptoms required by part A of these listings," although she does not specify which symptoms are supported by the record. (R. 15). As to Part B of Listing 12.04 and Listing 12.06, the ALJ found that Plaintiff's "mental conditions do not result in marked or equivalent limitation in two (in fact, in any) of the

---

[33]A claimant also may meet the required level of severity for Listing 12.06 by satisfying the requirements of Parts A and C. Plaintiff has not argued that she meets the requirements of Part C. Therefore, the Court will not address this part of Listing 12.06.

30

four categories set out in part B." (R. 16).

Based on the ALJ's failure to specify which symptoms of Part A of Listing 12.04 and Part A of Listing 12.06 were not shown by the evidence in this case, Plaintiff asserts that it is impossible for this Court to properly review this finding.[34] As to Part B of Listing 12.04 and Listing 12.06, Plaintiff asserts that the GAF score of 47 assigned to her by Dr. Simmons on January 13, 2005 and the report of Dr. Uran's consultative psychological examination on April 29, 2004 support the conclusion that she has marked difficulties in social functioning and marked difficulties in concentration, persistence or pace. Thus, Plaintiff maintains that she satisfies Part B of these listings.

For purposes of this argument, the Court will assume that Plaintiff meets the Part A requirements of both Listing 12.04 and Listing 12.06. However, to meet the required level of severity for either Listing 12.04 or Listing 12.06, Plaintiff also must

---

[34]Regarding Part A of Listing 12.04, Plaintiff maintains that the evidence clearly shows that she suffers from appetite disturbance with change in weight, sleep disturbance, psychomotor agitation, decreased energy, feelings of guilt, difficulty concentrating, thoughts of suicide and paranoid thinking. Therefore, she meets this part of Listing 12.04. As to Part A of Listing 12.06, Plaintiff maintains that she meets this part of the listing due to her recurrent, severe panic attacks which are manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week and her recurrent recollections of a traumatic experience which is a source of marked distress. (Pl's Brief, p. 10).

31

show that she meets Part B of these listings,[35] and the Court is compelled to conclude that the ALJ cited substantial evidence supporting her determination that Plaintiff does not meet Part B of these listings.

Specifically, with respect to activities of daily living, the ALJ found that Plaintiff was mildly restricted, noting that Plaintiff reported a fairly broad range of activities in the Daily Activities Questionnaire completed on October 11, 2005, and that Plaintiff testified she is single, lives alone and is able to maintain a household. As to Plaintiff's ability to maintain social functioning, the ALJ found that Plaintiff has moderate difficulty, noting that Plaintiff appears to have a limited social life, but the record lacks evidence of serious incidents with family, friends and authority figures or difficulty interacting with physicians and medical staff. Moreover, the evidence concerning Plaintiff's problems with large groups of people was accommodated in the RFC assessment by limiting Plaintiff to no more than occasional contact with the public and coworkers. Turning to Plaintiff's ability to maintain concentration, persistence and pace, the ALJ found that Plaintiff

---

[35]*See* Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir.2004), *quoting*, Sullivan v. Zebley, 493 U.S. 521, 530 (1990)("For a claimant to show his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.").

32

has moderate difficulty, noting that, although her depression and anxiety reasonably may be expected to limit her concentration, persistence and pace, the extent of her limitation in this area did not preclude the simple, low stress tasks with no public contact and minimal contact with peers and supervisors specified in the RFC assessment. Finally, regarding repeated episodes of decompensation each of extended duration, the ALJ found that the evidence established an episode of decompensation, *i.e.*, Plaintiff's hospitalization in January 2004 for an alleged suicidal gesture.[36] However, the ALJ noted that Plaintiff improved on medication; she was cooperative during the hospitalization; her mood was good; her thought processes were within normal limits; and she was alert and oriented. (R. 16).

### iii

Next, Plaintiff asserts that the ALJ erred in assessing her RFC. Again, after consideration, the Court cannot agree.

As noted by the Commissioner,[37] in a Disability Report completed by Plaintiff in connection with her current application for SSI, Plaintiff reported that she is unable to work for the

---

[36]As noted previously, at the time of her involuntary admission to Butler Memorial Hospital in January 2004, Plaintiff adamantly denied that she had attempted to commit suicide. Rather, Plaintiff indicated that she was intoxicated and that an empty medication bottle in her room was misconstrued as an intentional drug overdose. (R. 331).

[37]Df's Brief, p. 11.

33

following reasons: "I'm not able to keep my thoughts straight. I don't like to be around a lot of people." (R. 145). As the Commissioner further notes, the ALJ accommodated these mental limitations by restricting Plaintiff's RFC to work that does not require complex decisionmaking or the need to follow detailed instructions, *i.e.*, work involving simple, low stress tasks (R. 16), and work that does not require interaction with the public or more than minimal interaction with coworkers and supervisors.

With respect to the determination that Plaintiff's concentration difficulties did not preclude all substantial gainful activity, the ALJ noted that (a) the report of Plaintiff's discharge from Butler Memorial Hospital in January 2004 indicated Plaintiff's thoughts were within normal limits with no thought disorder (R. 17, 321); (b) the report of Plaintiff's consultative psychological examination by Dr. Uran in April 2004 indicated Plaintiff's thought process was normal and relevant with coherent language (R. 18, 357); (c) the report of Plaintiff's initial psychiatric assessment by Dr. Simmons in January 2005 indicated Plaintiff's speech and thought patterns were goal directed (R. 18, 401); (d) the report of Plaintiff's psychiatric evaluation by Dr. Simmons in February 2005 indicated Plaintiff's memory, recall and orientation were intact with no pressure or loose associations (R. 18, 397); and (e) in the medical source statement completed by Dr. Simmons in October

34

2005, he opined that Plaintiff was only slightly limited in her
ability to understand and remember short, simple instructions and
only moderately limited in her ability to carry out short, simple
instructions (R. 18, 404). Under the circumstances, the
Court is compelled to conclude that substantial evidence supports
the ALJ's determination that, while abstaining from the use of
alcohol, Plaintiff's concentration difficulties do not preclude
simple, low stress work.

As to the ALJ's determination that Plaintiff's dislike of
being "around a lot of people" did not preclude all substantial
gainful activity, the ALJ noted that, although Plaintiff appears
to have a limited social life, the record lacks evidence of any
serious incidents with family, friends or authority figures (R.
16); that the evidence from Plaintiff's treating sources does not
mention any serious difficulty interacting with Plaintiff (R.
16); and that in a Daily Activities Questionnaire completed in
October 2005, Plaintiff reported she is able to go grocery
shopping, eat out with friends and use public transportation.
(R. 19, 193-95). Under the circumstances, the Court is compelled
to conclude that substantial evidence supports the ALJ's
determination that Plaintiff retains the ability to perform jobs
that do not involve contact with the public and only minimal

contact with co-workers and supervisors.[38]

## iv

Finally, Plaintiff asserts that the hypothetical question posed to the VE by the ALJ was deficient because it failed to include Dr. Uran's opinion regarding Plaintiff's "extreme" limitation in various work-related mental activities, and, therefore, the ALJ's reliance on the VE's testimony in response to the hypothetical question to support the adverse decision in this case was erroneous. Again, the Court finds Plaintiff's argument unpersuasive.

As correctly noted by Plaintiff,[39] a VE's testimony in response to an ALJ's hypothetical question does not constitute substantial evidence supporting an adverse decision unless the hypothetical question accurately portrays all of the limitations resulting from a claimant's impairments. *See, e.g.*, Burns v. Barnhart, 312 F.3d 113 (3d Cir.2002). Contrary to Plaintiff's position and as discussed by the Court in connection with

---

[38]In this connection, the Court also notes that the ALJ's determination regarding Plaintiff's ability to engage in substantial gainful activity, despite her social limitations, is supported by the medical source statement completed by her psychiatrist in October 2005. As noted previously, Dr. Simmons opined that Plaintiff had no limitation in her ability to interact appropriately with co-workers; she was only slightly limited in her ability to interact appropriately with supervisors; and she was only moderately limited in her ability to interact appropriately with the public. (R. 405).

[39]Pl's Brief, pp. 12-13.

Plaintiff's first argument regarding the weight accorded the medical opinions in this case, the ALJ was not required to accept Dr. Uran's opinion regarding the extent of Plaintiff's limitations in various work-related mental activities, and the ALJ adequately set forth her reasons for not according significant weight to Dr. Uran's opinion.

Simply put, the hypothetical question posed to the VE by the ALJ in this case was based on her assessment of Plaintiff's RFC, and the RFC assessment was supported by, among other things, the medical source statement completed by Plaintiff's treating psychiatrist. Accordingly, the Court cannot conclude that the ALJ erred in relying on the VE's testimony to deny Plaintiff's application for SSI.

William L. Standish
United States District Judge

Date: November /9, 2007

37